**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| KATELYNN R. GILPIN, | : | Case No. 3:18-cv-194 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

## DECISION AND ENTRY

---

## I.      <u>Introduction</u>

Plaintiff Katelynn R. Gilpin previously received Supplemental Security Income

based on disability as a child.  When she turned eighteen years old, the Social Security

Administration redetermined her eligibility for benefits as an adult and concluded that, as

of December 1, 2015, she was not under a disability.  Upon reconsideration, the

determination was upheld.  At Plaintiff's request, Administrative Law Judge (ALJ) Mark

Hockensmith held two hearings after which he concluded that she was not eligible for

benefits because she is not under a "disability" as defined in the Social Security Act.

Plaintiff brings this case challenging the Social Security Administration's denial of her

application for Supplemental Security Income.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), and the administrative record (Doc. #7).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Hockensmith's non-disability decision.

## II.     Background

Plaintiff asserts that she has been under a "disability" since December 1, 2015. She was eighteen years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 416.963(c). She has a limited education. *See id.* § 416.964(b)(3).

### A.     Plaintiff's Testimony

At her first hearing before ALJ Hockensmith, Plaintiff did not have an attorney. (Doc. #7, *PageID* #s 118-34). The ALJ offered to postpone the hearing if she wanted time to find counsel. After considering her options, Plaintiff decided to postpone it.

A few months later, at the second hearing, Plaintiff testified that she struggles with depression and anxiety. She sees a counselor at New Creation Counseling. *Id.* at 87. Plaintiff has a panic attack once or twice a week. *Id.* She has panic attacks when she has to make decisions, if something changes, or when she tries something new. *Id.* at 87-88. When she has one, she usually runs into a bathroom or into her room to hide and to try to breathe. *Id.* at 87. Additionally, "I see things that I shouldn't be seeing like in the mirror…. [I]f I go to the bathroom just to splash my face with some water to calm

myself down, I will see these little things of myself being like a monster or like a beast …
and then I start to cry because I'm getting worked up and I'm not feeling safe." *Id.* at 88.
Plaintiff has crying spells at least once or twice a month. *Id.* at 91. She cries if she gets
yelled at or has to calm herself down when she is anxious. *Id.*

She has trouble staying focused on one task at a time. For example, when she is
washing dishes, if she sees a basket of towels, she will stop washing dishes and start
folding towels. *Id.* at 89-90. She cannot concentrate on one thing for very long. *Id.* at
92. She cannot make it through an entire movie without thinking of other things and
leaving the room. *Id.* She also has some problems with her short-term memory but can
remember things from her childhood. *Id.*

Plaintiff lives in a house with her grandparents. *Id.* at 86. During a typical day,
she sits in her room and gets on her computer to talk to her friends or she gets herself
ready to do chores around the house. *Id.* Plaintiff does not have very many friends; she
only has one best friend who comes to see her. *Id.* at 100. Her chores include washing
dishes, sweeping, doing laundry, and taking care of her pets. *Id.* at 86.

Plaintiff tried to work at a daycare with the assistance of her job coach. *Id.* at 93-
94. After a week, she thought her job was going to change, her anxiety increased, and
"that's when that all went down." *Id.* at 94. For the three months before the hearing,
Plaintiff volunteered at a nursing home, helping two men play bingo. *Id.* She goes three
times a week—once for an hour and twice for an hour and a half. *Id.* at 95. She likes
volunteering because it makes her feel good. *Id.* at 96. But when she is having a rough
day, she does not go. *Id.* at 96-97. She also volunteers to help with kids at her church.

*Id.* at 97.  She tries to make a little lesson and then they play games.  *Id*.  However, this sometimes leads to increased anxiety and as a result, she does not help unless they need her to.  *Id*.  She started babysitting her neighbor's five-year-old child in late fall 2016.  *Id.* at 98.  Although it depended on the parents' schedule, she usually babysat three days a week from 8:00 a.m. to 12:30 p.m.  *Id.* at 99.  At the time of the hearing she was not babysitting because it was summer and she was not sure if she would babysit the child again in the fall.  *Id.* at 99.

Plaintiff does not think she could perform a full-time job because she is afraid she will see someone that bullied her in the past, panic, and not know what to do.  *Id.* at 90.  In addition, she would "freak out" and not want to return if something at the job changed.  *Id.*

### B.      Brenda Gilpin's Testimony

Plaintiff's grandma, Brenda Gilpin, also testified at the hearing before ALJ Hockensmith.  *Id.* at 101.  Plaintiff moved in with her grandma when she was high school.  *Id.* at 102.  But, even before then, Ms. Gilpin took partial care of her when Plaintiff's mother was working.  *Id*.

Ms. Gilpin has witnessed Plaintiff's panic attacks.  She explained, "She cries.  She shakes…. [Y]ou can't hardly reason with her and you have to get her to a safe place and there's not much I can do but comfort her …."  *Id.* at 103.  Plaintiff has meltdowns when something is not "on an even keel" or is "out of whack."  *Id*.  Additionally, she sometimes has a meltdown when there are lots of people.  *Id*.

Plaintiff has outbursts too. *Id*. She gets mad if Ms. Gilpin tells her to do something that she does not think she can do or tells her something she does not want to hear. *Id.* at 107-08. There are some things that Ms. Gilpin can discuss with Plaintiff one day and Plaintiff is perfectly fine but then the next day, the same discussion might set Plaintiff off. *Id.* at 108. However, that does not happen very often at Ms. Gilpin's house because things are "pretty even keel." *Id.* at 107-08. If Plaintiff is with her mother—who has a lot of the same issues as Plaintiff—she has more frequent outbursts. *Id.* at 108.

Ms. Gilpin explained that Plaintiff has a difficult time with change. For example, if Plaintiff was working and one day her boss changed what she was doing, she would be scared and could have a "full panic attack." *Id.* at 104. She would then need to find a safe place where she could try to calm herself down. *Id.* at 105. How long she needs to calm down depends on the situation. If it is not too bad, she may be able to just leave the room to calm herself down. However, it could take her hours or the rest of the day to calm down. *Id.* at 105.

Ms. Gilpin sometimes has to help Plaintiff stay focused and has to remind her to do things like chores and cooking. *Id.* at 104. She sometimes has to remind her to take her medication. *Id*.

Ms. Gilpin does not believe Plaintiff is able to work because she would get upset if something happened and other people are rude in the workplace. *Id.* at 106. Further, "[Plaintiff] is different and she says things off the wall that other people don't understand …." *Id*. However, Ms. Gilpin hopes that Plaintiff can work someday in a safe environment where people are not mean to her. *Id*. Ms. Gilpin indicated that Plaintiff

would need coworkers and a boss that always spoke to her in a nice and pleasant tone. *Id.* at 108.

## C. Medical Opinions

### i. Fred M. Sacks, Ph.D.

Plaintiff was referred to Dr. Sacks for a neuropsychological evaluation "because of multiple functional deficits and concerns with cognitive, emotional and behavioral functioning." *Id.* at 817. As part of his evaluation, Dr. Sacks reviewed Plaintiff's medical and school records and met with Plaintiff six times between April and July 2013. *Id.* at 817-18. He administered several tests to Plaintiff, including, for example, the Wechsler Intelligence Scale for Children–Fourth Edition; Halstead-Reitan Neuropsychological Test Battery; Personality Assessment Inventory–Adolescent; and Conners' Continuous Performance Test–II. *Id.* at 819. Dr. Sacks also administered two tests to Plaintiff's mother and grandmother—the Behavior Rating Inventory of Executive Function (BRIEF) and the Gilliam Autism Rating Scale–Second Edition.

Relevant to the present case, Plaintiff's mother and grandmother collaboratively completed the Gilliam Autism Rating Scale–Second Edition (GARS-2). Their ratings yielded an Autism Index of 89 which is indicative of a "very likely" or probable diagnosis of autistic disorder. Dr. Sacks noted, "Review of item responses indicates that [Plaintiff] has stereotyped behaviors, communication problems, and difficulties in social interaction which are generally characteristic of individuals who present autistic disorder." *Id.* at 824. Looking first at stereotyped behaviors, Plaintiff frequently avoids eye contact, stares at her hands or objects, has very significant preferences for foods and

refuses to eat what most people usually will eat. She frequently whirls or turns in circles as well as rocking back and forth while seated and standing. *Id.* Turning to the domain of communication problems, Plaintiff frequently looks away or avoids looking at the speaker when her name is called. *Id.* She sometimes repeats words or phrases over and over, responds inappropriately to simple commands, and does not ask for things that she may want. *Id.* However, "More significant problems are reported in the domain in social interaction." *Id.* For example, Plaintiff frequently avoids eye contact or looks away when someone is looking at her, withdraws or remains rather aloof and detached in group situations, becomes upset when her routines are changed, and responds negatively or with temper tantrums when given commands, requests or directions." *Id.* She less frequently stares or looks unhappy or unexcited when praised or entertained; resists physical contact with others; is generally reticent or unwilling to give displays of affection; does things repetitively or ritualistically; and lines up objects in a precise, orderly fashion and then becomes upset when the order is disturbed. Dr. Sacks concluded, "The combination of these behaviors in multiple domains yields a 'very likely' classification of [Plaintiff] as having autistic disorder." *Id.* at 824.

Dr. Sacks summarized his findings: "[Plaintiff] is functioning within the borderline range of intelligence and presenting with moderate cerebral impairment. Neurocognitive deficits are quite prominent in attentional functioning and higher cortical functioning including problem-solving and abilities to organize experience. Problems in social-emotional functioning are also quite prominent. [Plaintiff] is presenting with multiple and severe emotional problems. Her history is positive for a past episode of

major depressive disorder, severe, with psychotic features." *Id.* at 825. Dr. Sacks concluded that Plaintiff meets the diagnostic criteria for major depressive disorder, recurrent, mild; posttraumatic stress disorder; attention deficit hyperactivity disorder, combined type; autistic disorder; and borderline intellectual functioning. He recommended continued medication management and therapy. *Id.* at 817-26.

Dr. Sacks evaluated Plaintiff again in 2017 "for the purpose of determining eligibility for social security insurance benefits." *Id.* at 1381. He met with her five times and reviewed her medical and school records. He administered several of the same tests (some different versions) to Plaintiff. And, his finding from the second round of tests was "generally, consistent with the previous (2013) neuropsychological test findings ...." *Id.* at 1389.

Dr. Sacks administered the Gilliam Autism Rating Scale–Third Edition to Plaintiff's grandmother. "Overall, the ratings by the grandparent are highly significant for [Plaintiff] meeting diagnostic criteria for autism spectrum disorder which further compounds her general problems in neurocognitive, social and emotional functioning." *Id.* at 1388.

Dr. Sacks diagnosed unspecified neurocognitive disorder; major depressive disorder, recurrent episode, severe; attention deficit/hyperactivity disorder, predominantly inattentive presentation; autism spectrum disorder; and borderline intellectual functioning. *Id.* at 1390. Dr. Sacks "strongly recommended that [Plaintiff] be viewed as eligible for continuation of her social security benefits." *Id.* at 1389.

In June 2017, Dr. Sacks completed a mental impairment questionnaire. He

indicated that Plaintiff had marked or extreme limitations in every functional activity.  *Id.* at 1392-93.  He opined, "[Plaintiff] has multiple cognitive impairments and functions, generally, at a moderate level of cerebral impairment.  Her capabilities to function effectively in a work environment are further compromised to an extreme degree by multiple and sometimes severe difficulties which contribute to significant difficulties in maintaining emotional equilibrium."  *Id.* at 1393.

ii.      *Paul Tangeman, Ph.D., & Leslie Rudy, Ph.D.*

Dr. Tangeman reviewed Plaintiff's record in November 2015.  He found that she had two non-severe impairments—obesity and sleep-related breathing disorders—and four severe impairments—affective disorders; schizophrenic, paranoid, and other functional psychotic disorders; ADD/ADHD; and anxiety disorders.  *Id.* at 149.  He opined that Plaintiff has the ability to complete any complexity of task in a stable environment in which changes are explained, and she only has superficial contact with others.  *Id.* at 149-53.

In June 2016, Dr. Rudy reviewed Plaintiff's record.  She concluded that Plaintiff "is able to perform simple and routine 1–3 step tasks in work that does not require her to adhere to strict production quotas or deadlines and also only requires occasional and superficial social interaction.  It should be situated in a fairly static work environment with few changes."  *Id.* at 700-16.

III.   **Standard of Review**

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements.  *Bowen v.*

*City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term

"disability"—as defined by the Social Security Act—has specialized meaning of limited

scope. It encompasses "any medically determinable physical or mental impairment" that

precludes an applicant from performing a significant paid job—i.e., "substantial gainful

activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at

469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines:

"whether the ALJ applied the correct legal standards and whether the findings of the ALJ

are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir.

2007). Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record

contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741

F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.

2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard

is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to

support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.

Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a

scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241

(citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal

criteria—may result in reversal even when the record contains substantial evidence

supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Hockensmith to evaluate the evidence connected to Plaintiff's eligibility for benefits. He did so by considering the steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. He reached the following main conclusions:

> Since December 1, 2015, Plaintiff has had the severe impairments of major depressive disorder, attention-deficit hyperactivity disorder, psychotic disorder, anxiety, and borderline intellectual functioning.
>
> Since December 1, 2015, she does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.
>
> Since December 1, 2015, her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "a full range of work at all exertional levels but with the following nonexertional limitations: (1) simple, routine, repetitive tasks; (2) in a static work environment with few changes in routine and those changes explained in advance; (3) no fast paced work or strict production quotas; (4) occasional interaction with the public, coworkers and supervisors; (5) no math or reading above the 6th grade level; and (6) would be off task less than 10% of [a] workday."

She has no past relevant work.

Since December 1, 2015, she could perform a significant number of jobs that exist in the national economy.

(Doc. #7, *PageID* #s 54-68).  These main findings led the ALJ to ultimately conclude that Plaintiff's disability ended on December 15, 2015, and she has not become disabled again since that date.  *Id.* at 68.

## V.    Discussion

Plaintiff asserts that the ALJ failed to reasonably weigh the assessments from the neuropsychological examinations of Dr. Sacks "which strongly support Plaintiff's allegations of disabling mental health symptoms."  (Doc. #8, *PageID* #s 1401-05). Further, ALJ Hockensmith erred in rejecting her autism diagnosis.  *Id.* at 1405-08.

The Commissioner maintains that substantial evidence supports both the ALJ's evaluation of the medical opinions and his assessment of Plaintiff's autism diagnosis.

### A.    Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions.  "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations omitted).  The rule is straightforward:

Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

Regardless of the source, the Regulations require an ALJ to consider and evaluate every medical opinion in the record. *See* 20 C.F.R. §§ 416.927(b), (c). "Unless a treating source's opinion is given controlling weight, the administrative law judge *must explain* in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." *Id.* at (e)(2)(ii) (emphasis added). In deciding what weight to assign an opinion, an ALJ must consider the following factors: examining relationship; treatment relationship; supportability; consistency; specialization; and other factors. *Id.* at (c).

In the present case, ALJ Hockensmith concluded—and Plaintiff does not contest—that Dr. Sacks is not a treating source. Despite his conclusion, the ALJ notes that under the criteria for evaluating treating source opinions, Dr. Sacks' opinions are not entitled to controlling or deferential weight "because it is not well supported by medically acceptable clinical findings in the preponderance [of the] record and is inconsistent with other substantial medical evidence of record." (Doc. #7, *PageID* #64). The ALJ instead assigned Dr. Sacks' opinions little weight. Because the ALJ did not give controlling weight to a treating physician's opinion, he must explain the weight given to Dr. Sacks' opinions using the factors set forth above. *See* 20 C.F.R. § 416.927(e)(2)(ii).

ALJ Hockensmith did consider some of the factors. For instance, the ALJ properly recognized that Dr. Sacks is a specialist—specifically, a neuropsychologist. (Doc. #7, *PageID* #64); *see* 20 C.F.R. § 416.927(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

The ALJ also discussed the examining relationship between Dr. Sacks and Plaintiff. He acknowledged that Dr. Sacks examined Plaintiff but discounted Dr. Sacks' opinions because he only saw Plaintiff on "a few occasions in 2013, and not again until 2017." (Doc. #7, *PageID* #64). Dr. Sacks met with Plaintiff six times in 2013 and five times in 2017. To the extent the ALJ was considering whether Dr. Sacks examined Plaintiff, the ALJ properly addressed the first factor—"examining relationship." However, the ALJ's conclusion involves more than the examining-relationship factor; it encompasses the treatment-relationship factor—specifically, the length of the treatment relationship and the frequency of examination. Notably, that subsection refers only to "treating sources," not all medical sources. *See* 20 C.F.R. § 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). To the extent that the ALJ was considering the treatment-relationship factor, he held Dr. Sacks to the higher standards of a treating physician.

The ALJ did not, however, apply the same higher standard to the State agency consultants' opinions. In contrast to the "little weight" the ALJ assigned to Dr. Sacks, he concluded that the opinions of State agency reviewing psychologists, Dr. Tangeman and

Dr. Rudy, were entitled to "moderate weight." (Doc. #7, *PageID* #63). Although the ALJ discounted Dr. Sacks' opinions because he only examined Plaintiff on a few occasions, the ALJ did not mention that State agency consultants did not examine Plaintiff. Further, he ALJ did not address the consultants' failure to provide explanations in support of their opinions. This is important "because nonexamining sources have no examining or treating relationship with [a claimant], the weight [the Social Security Administration] will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions." 20 C.F.R. § 416.927(c)(3). Moreover, the ALJ ignored or overlooked that the consultants did not review any of Dr. Sacks' opinions. The Regulations, however, specifically point out that "[the Administration] will evaluate the degree to which these medical opinions consider all of the pertinent evidence in [a claimant's] claim, including medical opinions of treating and other examining sources." *Id.*

The ALJ gave one primary reason for assigning moderate weight to the consultants' opinions: "Their opinions are generally supported by objective signs and findings in the preponderance of the record, including the records submitted after their assessments." (Doc. #7, *PageID* #63). He did not identify any of the objective signs and findings. Instead, he noted, "Dr. Rudy's limitation to simple, routine tasks more than adequately accounts for [Plaintiff's] borderline intellectual functioning …." *Id.* And, he rejected their limitation to "only occasional and superficial social interaction" because it "is more restrictive than warranted by this record." *Id.* The ALJ erred by failing to apply the same level of scrutiny to reviewing psychologists' opinions as he applied to treating

source's opinion. *See Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (July 2, 1996)) ("A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires.").

Turning back to Dr. Sacks' opinions, the ALJ gave additional reasons for assigning his opinions "little weight." He found they are "not fully supported by objective signs and findings in his own reports and in the preponderance of the record." (Doc. #7, *PageID* #64). However, the ALJ acknowledged that Dr. Sacks administered IQ tests which indicated borderline intellectual functioning. He accounted for those test results by limiting Plaintiff to simple, routine, repetitive tasks with no math or reading above the 6th grade level. The ALJ did not address any of the other tests Dr. Sacks administered to Plaintiff.

Instead, the ALJ turned to statements from Plaintiff and her grandmother. He found, "Many of his other findings are based on the subjective statements of [Plaintiff] and her grandmother, which as discussed herein, are not fully supported by objective signs and findings." *Id.* at 64. The ALJ gives one example: "Dr. Sacks based the autism disorder diagnosis primarily on the answers from [Plaintiff's] mother and grandmother on the Gilliam Autism Rating Scale." *Id.*

Substantial evidence does not support the ALJ's conclusion. There is nothing in Dr. Sacks' evaluations that suggests that he based any of his opinions exclusively on Plaintiff's grandmother or mother's statements. Indeed, the ALJ overlooked or ignored

the numerous other tests Dr. Sacks administered to Plaintiff—for example, in 2013, he

administered to Plaintiff:

1. Halstead-Reitan Neuropsychological Test Battery, including:
   a. Category Test,
   b. Tactual Performance Test,
   c. Trail Making Test,
   d. Seashore Rhythm Test,
   e. Speech-Sounds Perception Test,
   f. Finger Oscillation Test,
   g. Grip Strength,
   h. Sensory Perceptual Examination,
   i. Lateral Dominance Examination, and
   j. Aphasia Screening Examination;
2. Conners' Continuous Performance Test-II;
3. Integrated Visual-Auditory Continuous Performance Test-Plus;
4. Personality Assessment Inventory-Adolescent; and
5. Adolescent Psychopathology Scale.

(Doc. #7, *PageID* #819) (as mentioned above, he also administered the Wechsler

Intelligence Scale for Children-Fourth Edition and the Picture Arrangement subtest from

the Wechsler Intelligence Scale for Children-Third Edition). Moreover, in 2017, Dr.

Sacks administered to Plaintiff:

1. Wechsler Adult Intelligence Scale-Fourth Edition;
2. Wechsler Memory Scale-Fourth Edition (selected subtests);
3. Halstead-Reitan Neuropsychological Test Battery (including the same tests identified above);
4. Conners' Continuous Performance Test-3;
5. Integrated Visual-Auditory Continuous Performance Test-Plus;
6. Personality Assessment Inventory; and
7. Beck Depression Inventory-II

*Id.* at 1383. It is not reasonable to conclude that Dr. Sacks did not rely on the results of

any of these tests in diagnosing autism.

Likewise, the ALJ does not acknowledge that, in preparation for his evaluations of Plaintiff, Dr. Sacks reviewed progress notes from Stacey Fellers, LPCC; medical records from the emergency department of Upper Valley Medical Center; an evaluation team report from Tri- Village Local School District; and a central auditory processing preliminary evaluation. *Id.* at 817-18. Ms. Fellers' progress notes revealed that Plaintiff's treatment included cognitive behavioral therapy and solution-oriented therapy for anger management, recurrent conflicts with her mother, mood instability, episodic displays of oppositional and defiant behavior; self-injurious behavior, and communication skills. This treatment is consistent with Plaintiff's grandmother's statements indicating that Plaintiff has frequent temper tantrums when she is told to do something she does not want to do; she gets upset when routines are changed; and she is "rather socially isolated." *Id.* at 1388.

The ALJ also discounted Dr. Sacks' opinions because treatment notes from Plaintiff's treating psychiatrist do not mention autism as a working diagnosis. *Id.* at 64. However, as Plaintiff points out, Dr. Khavari also did not perform testing to substantiate an autism diagnosis. Interestingly, in 2013 (a little more than two years before Plaintiff was notified that she was no longer disabled), Denise Rabold, Ph.D.—a State agency consultant—found that Plaintiff's severe impairments included "autistic disorders and other pervasive developmental disorders." *Id.* at 139.

The ALJ found, "the mental health treatment notes consistently document improvement in [Plaintiff's] depression and anxiety, which is inconsistent with Dr. Sacks' findings of marked to extreme impairment." *Id.* at 64. Importantly, despite the

four-year gap between examinations and the updated or different tests, Dr. Sacks'
evaluations are consistent.  Further, the ALJ does not acknowledge that Dr. Sacks
addressed Plaintiff's variable symptoms.  Specifically, he noted, "While depressed mood
appears to be the most prominent, there are signs in the psychological test record that
[Plaintiff] does episodically experience elevated and variable mood."  *Id.* at 822.  A
review of Plaintiff's treatment notes supports his finding.

For example, in September 2014, Dr. Khavari indicated that Plaintiff was doing
better with having flashbacks since they changed her medication.  *Id* at 1244.  But, she
reported increased depression for the three weeks before her appointment.  She had
irritability, crying, and some feelings of hopelessness but also more motivation and
energy.  And, "She endorses some peer relationship difficulties at her new school."  *Id.*
A month later, in October 2014, Plaintiff reported to Dr. Khavari that, since her last
appointment, she has had more depressive symptoms such as sadness, irritability,
anhedonia, poor motivation, lower energy, and passive thoughts of self-harm.  *Id.* at
1243.  Additionally, she has had several panic attacks that she describes as coming out of
nowhere.  Her symptoms—which peaked over an hour—include shortness of breath,
feeling numb and tingly, being nauseated, and feeling smothered.  During those episodes,
she also hears voices.  Her family increased her dose of Abilify to decrease her episodes
but they have not seen significant improvement.  *Id.*

Treatment notes then indicate that she experienced some improvement in her
symptoms.  In February 2016, for instance, she had had less depressed moods and
irritability and was more hopeful and energetic.  *Id.* at 1235.  But, in August 2016, "She

only endorses auditory hallucinations when she is anxious and overwhelmed. She does endorse increased anxiety, excessive worry, feeling overwhelmed when she thinks about her future. This occurs several times per week." *Id.* at 1231. Plaintiff reported to Dr. Khavari that during an appointment with a job coach, she became overwhelmed with multiple requests and had a meltdown. *Id.* And, Dr. Khavari noted, "Patient became emotional during the interview and was indecisive when discussing different options. She finally agreed upon taking increased doses [of] Zoloft to help with her increased anxiety." *Id.*

The ALJ further found, "Dr. Sacks also referred to prominent issues in social emotional functioning, but as discussed above, she reported activities such as communicating with friends, babysitting, and volunteering." *Id.* at 64. These activities do not conflict with Dr. Sacks' evaluations. For example, although Plaintiff testified that she talks to her friends online, she only talks to them online; she does not see them. *Id.* at 86, 100. She has one friend that she sees (albeit not very often). *Id.* at 100-01. Likewise, she testified that she babysat one five-year-old child three days a week for up to four and a half hours. *Id.* at 98-99. And, even with just one child, she had anxiety when problems with him arose. *Id.* at 99. She volunteers at a nursing home, helping two men play bingo, for a total of three and a half hours per week. *Id.* at 95. And, if she is having a rough day, she probably would not go. *Id.* at 96-97. She also volunteered at her church to work with kids. But, she did that more often when she was around seventeen years old (and under a disability) and it was on Wednesdays, not Sundays. *Id.* at 97-98. Each of

these activities are incredibly limited but can cause Plaintiff anxiety. This is consistent with Dr. Sacks' assessment.

Last, the ALJ assigned little weight to Dr. Sacks' opinion that Plaintiff was eligible for disability benefits. He noted, "The determination of disability is a question reserved to the Commissioner, and there is no indication that Dr. Sacks is qualified to offer an opinion on [Plaintiff's] employability." *Id.* at 64. Although medical source opinions on issues reserved to the Commissioner are not entitled to special significance, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." Soc. Sec. R. 96-5p, 1996 WL 374183, at *2-3 (Soc. Sec. Admin. July 2, 1996). In evaluating a similar statement by an ALJ, the Seventh Circuit emphasized,

> The pertinent regulation says that "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that you are disabled." 20 C.F.R. § 404.1527(e)(1). That's not the same thing as saying such a statement is improper and therefore to be ignored, as is further made clear when the regulation goes on to state that "the *final* responsibility for deciding" residual functional capacity (ability to work—and so whether the applicant is disabled) "is reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2). And "we will not give any *special* significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(3).

*Bjornson v. Astrue,* 671 F.3d 640, 647-48 (7th Cir. 2012) (emphasis in original). Thus, the fact that Dr. Sacks provided his opinion about Plaintiff's inability to work does not properly serve as a ground for placing little weight on Dr. Sacks' opinion.

In sum, although ALJ Hockensmith provided some reasons for discounting Dr. Sacks' evaluations, he failed to provide reasons—supported by substantial evidence—for

rejecting Dr. Sacks' evaluations. And, because the ALJ did not assign controlling weight to a treating physician's opinion, this constitutes error. 20 C.F.R. §§ 416.927(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.")

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[1]

## B.     Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

---

[1] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required analysis to determine anew whether Plaintiff was under a disability and whether her application for Supplemental Security Income should be granted.

## IT IS THEREFORE ORDERED THAT:

1.     The Commissioner's non-disability finding is vacated;

2.     No finding is made as to whether Plaintiff Katelynn R. Gilpin was under a "disability" within the meaning of the Social Security Act;

3.      This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4.      The case is terminated on the Court's docket.


Date: December 11, 2019                   *s/Sharon L. Ovington*
                                               Sharon L. Ovington
                                               United States Magistrate Judge